## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002,<br><br>SAFARI CLUB INTERNATIONAL BOW HUNTERS<br>WEST MICHIGAN CHAPTER, INC.<br>2485 Wilshere Drive<br>Jenison, Michigan 49428, and<br><br>SPORTSMEN'S ALLIANCE FOUNDATION<br>801 Kingsmill Parkway<br>Columbus, Ohio 43229,<br><br>     Plaintiffs,<br><br>        v.<br><br>MIGUEL CARDONA, Secretary<br>U.S. Department of Education and<br><br>U.S. DEPARTMENT OF EDUCATION<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>     Defendants. | Civil Case No. 23-_____ |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

## **INTRODUCTION**

1.      This action challenges a United States Department of Education policy that misinterprets the Bipartisan Safer Communities Act, Pub. L. 117-159 ("BSCA"), to prohibit use of federal education funds for archery, shooting sports, hunter education, and outdoor education programs in schools (the "Defunding Policy").

2.      The BSCA was enacted in 2022 following two mass shooting tragedies perpetrated by teenagers, including a shooting that killed 19 students and two teachers at an elementary school in Uvalde, Texas.  Through the BSCA, Congress sought to provide greater mental health resources for students, as well as to make schools safer and avoid similar tragedies.

3.      However, the Department is working at cross-purposes and contrary to Congress' intent.  The Department has adopted a policy that defunds vital programs that improve student self-esteem and mental health.

4.      Archery, shooting sports, hunter education, and outdoor education programs provide students with valuable tools, including improved mental focus and training in essential life skills.  Research has shown that these programs make students healthier and happier.  They help students do better in school.  And they open the door to outdoor experiences and a relationship with nature that students might not otherwise experience.  The Defunding Policy, which misinterprets the BSCA contrary to Congress' intent, will diminish student access to these tools by reducing the already limited funding available to these programs, chilling expansion of these programs, and forcing the closure of these programs.

5.      Plaintiffs Safari Club International ("SCI"), SCI Bow Hunters West Michigan Chapter, Inc. ("West Michigan Bowhunters"), and Sportsmen's Alliance Foundation ("SAF") bring this action on behalf of themselves, their affiliates, and their members who support archery, shooting sports, hunter education, and outdoor education in schools.

1

6.      Plaintiffs and their members have invested extensive resources in archery, shooting sports, hunter education, and outdoor education programs in schools, from Alaska to South Florida, and everywhere in between.  Collectively, Plaintiffs have trained over 7,000 teachers reaching over 1 million students, provided a conservation science and outdoor education curriculum in dozens of schools, and invested millions of dollars in these programs.

7.      Plaintiffs' past and future investments in these programs, teachers, and schools are substantially harmed by the Defunding Policy.

8.      Plaintiffs are aware of at least one program that has been defunded by application of the Defunding Policy, and many more programs are at risk of cancellation under this policy.

9.      These programs are assets to student development, with demonstrated benefits for mental and physical health, self-esteem, and academic success.   But the Defunding Policy has turned them into liabilities, where school administrators fear a loss of critical federal funding for having them in place.  Plaintiffs bring this suit to overturn the Defunding Policy, correct the Department's misinterpretation of the BSCA, and ensure that student access to archery, shooting sports, hunter education, and outdoor education is preserved.

10.     The Defunding Policy violates the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  It is arbitrary and capricious and not in accordance with law.  In a bill dedicating over $1 billion to improving mental health resources for students, Congress did not and would not bar funding for programs with a track record of doing exactly that—improving students' mental (and physical) health.  The Defunding Policy frustrates the Congress' purposes and intent in enacting the BSCA.

11.     Further, these programs do not involve "dangerous weapons."  Training bows and inert firearms are not "weapons."  Rather, as the educators who teach these programs explain, bows and firearms are "tools" for students to learn life skills.  But even if considered weapons, training

bows and arrows and inert or unloaded firearms are not "dangerous." The training bows used in school archery programs are set up with an extremely low draw weight as to not cause injury. Training arrows lack any sort of cutting edge. Inert firearms have been modified so they cannot be fired, and unloaded firearms lack a projectile that could be fired.[1]  Training bows and arrows, and inert or unloaded firearms, are no more dangerous than golf clubs, baseball bats, shop tools, or kitchen knives—which may also be covered by the Defunding Policy, if taken to its illogical and absurd extreme. The Defunding Policy has the potential to remove a whole host of outlets for youth to protect, preserve, and improve their mental health. The Department cannot assume that, when drafting the BSCA, Congress intended such "an absurd or manifestly unjust result." *E.g.*, *Lockhart v. Napolitano*, 573 F.3d 251, 260 (6th Cir. 2009) (citing *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509-10 (1989)). Because the Department's interpretation creates an "arbitrary, irrational and inequitable outcome," it violates the APA. See *id.*

12.    Plaintiffs seek declaratory and injunctive relief to ensure these crucial archery, shooting sports, hunter education, and outdoor education programs are protected, and that schools are not forced to cancel these programs because of the Department's misinterpretation of the BSCA.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702 and 706, and 28 U.S.C. § 1331.

14.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendant Secretary Cardona is an officer of a federal department acting in his official capacity and Defendant U.S. Department of Education is an agency of the United States. Plaintiff West Michigan Bowhunters

---

[1] Many hunter education programs teach firearm "safety," not firearm "use." These programs should not even fall under the Department's policy.

3

resides within this District and supports archery and hunter education programs in schools within this District. SCI has additional chapters in this District, all of which currently support or have supported archery, hunter education, and outdoor education programs in this District. The Defunding Policy will negatively impact these programs in this District.

15.    The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

16.    Plaintiff SCI is a not-for-profit corporation under Section 501(c)(4) of the Internal Revenue Code. SCI has approximately 70,000 members and advocates and 146 Chapters across the United States and around the world. SCI's purposes include, among other things, to advocate, preserve, and protect the rights of all hunters and to inform and educate the public concerning hunting and related activities.

17.    SCI has a long history of advocating for and supporting archery, shooting sports, hunter education, and outdoor education, including youth and school programs. Among other things, SCI advocates for increased archery and shooting access, defends methods of harvest (including archery), and promotes recreational access for archery and shooting in public comments to federal and state agencies and in litigation. SCI also invests its resources in archery, shooting sports, hunter education, and outdoor education programs. Most recently, SCI became a sponsor of USA Shooting, the national governing body for the Olympic and Paralympic shooting sports teams. Through donations, the SCI Foundation, SCI Chapters (as discussed below), and SCI have supported hundreds of youth archery programs and tournaments. Further, SCI has helped develop and provide hunter education programs for adults and youth alike, including hunter education taught for Congressional staff in SCI's Washington, DC office.

18.     SCI conducts its advocacy and education work in coordination with the Safari Club International Foundation ("SCI Foundation"), a not-for-profit corporation under Section 501(c)(3) of the Internal Revenue Code.  SCI Foundation's mission is to fund and manage worldwide programs dedicated to wildlife conservation, outdoor education, and humanitarian services.  SCI Foundation's purposes include, among other things, to carry out and support education programs on wildlife conservation, ecology, and natural resource management, which include the constructive role that hunting plays in natural resource conservation and land management.  Since 2000, SCI Foundation has invested over $80 million to promote science-based conservation through youth and teacher education, among other things, that show the importance of the hunting community around the world.  SCI Foundation's investments include many years of support for the National Archery in Schools Program ("NASP"), discussed below, and the Outdoors Tomorrow Foundation, which provides archery, hunter education, and outdoor education as a fully accredited physical education class in more than 1,000 schools around the United States.  SCI provides primary financial support for SCI Foundation.

19.     For almost 50 years, SCI Foundation offered an accredited outdoor education program called the "American Wilderness Leadership School" ("AWLS"), with a curriculum for teaching natural resource management and conservation including the role that hunting plays in these sciences.[2] AWLS focuses on hands-on learning, including firearms and archery training.  All AWLS educators were trained and certified in NASP, to bring that program back to their schools.

---

[2] During the Covid-19 pandemic, SCIF had to close the AWLS program temporarily.  Since 2021, SCIF no longer provides "AWLS" under that title.  SCIF now provides custom outdoor education programs to meet the needs of schools and school districts, universities, policy makers, and others, in a location and with a curriculum focused on the students' needs.  Because AWLS sparked school programs that continue to operate today, SCI's mission continues to benefit from its substantial multi-year investment in AWLS, as well as from its current investment in custom outdoor education programs.  Those continuing benefits are threatened by Defendant's Defunding Policy.
Additional information is available at: https://safariclubfoundation.org/education/scif-sables-education/.
Plaintiffs use the term "AWLS" in this Complaint to refer to the historic program.

Educators were also introduced to SCI's Chapter network.  SCI Chapters often supply the necessary funding to purchase start-up equipment (i.e., training bows and arrows, targets, etc.) for an educator to introduce NASP to his or her school.  Since 1977, nearly 7,000 educators were trained in conservation, outdoor education, and shooting sports through AWLS.  These educators reach an estimated 1 million students annually.  Most of these educators come from inner city and suburban schools, where the need for conservation and outdoor education is always high.

20.     SCI also works with its network of 146 Chapters across the United States and around the world.  SCI Chapters share the mission and purposes of SCI.  SCI and its Chapters support one another with fundraising, revenue-sharing, targeted conservation projects, and advocacy.  Among other benefits, SCI and SCI Foundation provide technical assistance to help Chapters invest in conservation and education projects.

21.     SCI Chapters around the country from Alaska to South Florida (and everywhere in between) invest heavily in youth archery and shooting sports programs and hunter education. These Chapters have spent hundreds of thousands of dollars on these programs.  The primary model by which SCI Chapters support these programs is to fund educators attending AWLS (and its successor), then further support those educators by funding program start-up costs, such as the initial purchase of NASP equipment.  As a few examples:

- The Alaska and Kenai Chapters have funded attendance in the AWLS program for multiple teachers, contributing tens of thousands of dollars in tuition and travel costs.  These Chapters have also funded thousands of dollars to purchase NASP start-up packages for community schools.  Further, the Alaska Chapter donates to the Outdoor Heritage Foundation of Alaska, which provides education initiatives, particularly for youth and women, which include hunter education and NASP.

- The Louisiana Acadiana Chapter has invested thousands of dollars to purchase equipment for an elementary and a high school archery team, and to help fund the state NASP tournament.

- The Columbia Basin (Washington State) Chapter has donated thousands of dollars to send teachers from two school districts to AWLS and to provide and refurbish

their equipment as needed.  Chapter members have been trained as NASP safety instructors to assist these teachers in running statewide NASP tournaments.  This Chapter has also purchased demonstration firearms for use in a hunter education course.

- The Kentuckiana Chapter—honoring the fact that NASP began in Kentucky— supports archery programs in schools every year and has sent teachers to AWLS almost every year since the Chapter began in 1994.  The Chapter also supports high school shooting teams, including help funding those team's participation in state shooting tournaments.

- The South Florida Chapter has supported a high school archery program for many years.  The Chapter has funded NASP training and certification for 216 teachers in the region, as well as contributed to start-up costs for NASP and outdoor education programs within the region, including the purchase of an outdoor exploration trailer to store equipment for archery, sport shooting, and outdoor skills training.

- The Wisconsin Chapter has sent teachers to attend AWLS for years, dating back almost to the chapter's founding in 1978, provided funds to purchase NASP start-up kits, and organized school archery tournaments.

- The Pittsburgh Chapter has sent teachers to AWLS since 1977.  Most recently, the Chapter donated to NASP programs at three schools to provide start-up equipment to these schools.

- A number of Chapters within Michigan have contributed to NASP programs and sent teachers to AWLS, including the Michigan, Lansing, and Novi Chapters.  Each of these Chapters has funded NASP programs in several schools and paid the tuition and travel expenses for local educators to attend AWLS.  The Novi Chapter donates annually to an annual outdoor education program in Michigan, similar to AWLS, to further increase the number of educators with outdoor education and NASP training in local schools.

22.    Plaintiff West Michigan Bowhunters is one example of an SCI Chapter that has invested in AWLS, archery in schools, and hunter education.  West Michigan Bowhunters is a non-profit organization under Section 501(c)(4) of the Internal Revenue Code.  It operates under SCI's Bylaws as a licensee of the national organization.  West Michigan Bowhunters has approximately 80 members in the western Michigan area.  In the period 2019-2023, West Michigan Bowhunters donated over $20,000 to send nine teachers to AWLS, to purchase equipment, and to support local tournaments for five NASP programs, as well as to fund youth hunting camps and hunts.  In this

period, West Michigan Bowhunters also contributed over $10,000 to support SCI Foundation and almost $100,000 to support SCI.

23.     Plaintiff SAF is a non-profit organization under Section 501(c)(3) of the Internal Revenue Code.  SAF is dedicated to protecting the hunting, fishing, and trapping heritage of America's sportsmen and sportswomen.  SAF achieves its mission through, among other things, public education and participation in legal proceedings that affect hunting, fishing, trapping, and wildlife management.  SAF's parallel entity, Sportsmen's Alliance, participates in legislative and political activities related to the same issues.  SAF has a national perspective on wildlife management issues, is experienced in defending hunting and fishing opportunities authorized by federal or state regulations in litigation, and often works with state-specific hunters' associations on matters of local interest to sportsmen and sportswomen.  SAF's membership consists of both individual members as well as organizational members.

24.     SAF advances its educational mission through providing its *Conservation Science* curriculum for use in high schools around the country.  *Conservation Science* was developed by SAF in partnership with several state fish and wildlife agencies, including the Ohio Department of Natural Resources and Pennsylvania Game Commission.  SAF paid its employees to write materials and SAF subsidizes the offering of *Conservation Science* written instructional materials to school districts at low affordable prices.  The curriculum is targeted to the eleventh and twelfth grade levels with traditional science topics applied to conservation, hunting, fishing, boating, and other outdoor activities.  The curriculum can be used as a stand-alone elective course or incorporated into an existing science, agriculture, or physical education course.  *Conservation Science* is currently offered in dozens of schools in multiple states, including in Florida, Iowa, Ohio, and Pennsylvania, with new school districts joining each semester as the program expands across the country.  At the center of the *Conservation Science* curriculum is the North American

8

Model of Wildlife Conservation, including the critical beneficial role of hunting in the management of wildlife populations. *Conservation Science* topics, units, and instruction are designed to be implemented by teachers in close collaboration with SAF and its partner state fish and wildlife agencies. These collaborations routinely include "hands on" activities in which students learn to safely handle and utilize firearms and archery equipment. As an example, one high school in the Midwest created a new STEM labs and activities elective using the *Conservation Science* instructional materials. The new course included hunter education training and instruction with "hands on" firearm safety, which eventually evolved into the creation of a trap-shooting team for the high school. That team now participates in competitions throughout the district and state. In another example, one school decided to incorporate *Conservation Science* as an alternative physical education course, with numerous outdoor "hands on" activities as part of the class, including archery training, fishing, boating, and other activities. All of these activities are conducted in collaboration with SAF-affiliated organizations.

25.     Fostering youth participation in teacher-led hunter education, shooting sports training and competition, and archery training and competition are values of significance to the achievement of SAF's mission that are achieved by SAF's *Conservation Science* program but are threatened by Defendants' Defunding Policy. School districts threatened with defunding because of their teachers' leading of hunter education, shooting sports, and archery activities will predictably direct their teachers to cease leading hunter education, shooting sports, and archery activities. Thus, the Defunding Policy injures SAF, by undercutting a program successfully achieving SAF's mission as described above. Further, because SAF supplied the labor and much of the funding for the development of the *Conservation Science* program, the Defunding Policy devalues SAF's investment in that program, further injuring SAF.

26.     In short, Plaintiffs support and provide conservation education opportunities,

9

including archery and shooting sports in schools, hunter education, and outdoor education. Teachers who have attended Plaintiffs' programs or have been financially supported by Plaintiffs feel strongly about the benefits that archery, hunter education, and outdoor education provide for their students. They are fearful that the Defunding Policy will cause their programs to be cut by their school districts—not for themselves, but because this will rob students of all the benefits that these programs provide.

27.     As one example, SCI Chapters in Wisconsin paid for a high school biology teacher (and now SCI member) at a low-income school to attend AWLS. This teacher was so inspired that she developed a full-credit course teaching the North American Model of Wildlife Conservation, archery, shooting, hunter education, population biology and management science, and more. Her course includes regular archery practice and a mentored hunt. This teacher's salary is paid by the school district, and the school district receives federal education funds. Although she fundraises for the extra-curricular aspects of her class (such as the hunt), this teacher is concerned that her program may be cut out of concern for the loss of federal funding due to the Defunding Policy. In discussing the harm that will arise if her program is cut, this teacher stressed how much archery, shooting, and outdoor education improve the mental health of her students. She firmly believes that their "90 minutes of archery practice can be better than 90 minutes of therapy." She offers concrete examples of how students who are struggling socially, emotionally, or academically improved after taking her course. As one such example, she described a sophomore who lost his father to cancer and spiraled down academically and socially after suffering this loss. This student took her course, fell in love with trap shooting, and found peace in this activity. He ended up graduating with honors and attending a well-known college. He took his father's shotgun with him and joined a sport shooting team at his college. As this teacher explained, students who are lost or labeled as "troublemakers" often "do not enjoy traditional classes," but they do enjoy being

out in the fresh air, trying a new physical activity. For these students in particular, archery and outdoor education helps them focus, and often helps them do better in their other classes.

28.     As another example, a teacher in a low-income high school in South Florida is an SCI member and former student and instructor at AWLS. Rather than having his attendance at AWLS funded by an SCI Chapter, this teacher was sent by his school district. He now works closely with SCI's South Florida Chapter, which has helped sustain his program through equipment donations. This teacher runs an after-school archery program. He helps train other teachers to run NASP and outdoor education. As this teacher poignantly explained, many children who live in inner cities live "inside" lives, in high rise apartments where they are "caged." Drawing a parallel to nature, this teacher noted that an animal put in a cage may strike out. In this teacher's experience, outdoor education, especially physical activity like archery, can help release some of the stress for these children. Outdoor education and archery programs provide a healthy, physical outlet, as well as mentoring and healthy competition. In other words, these programs offer exactly the type of outlet the BSCA encourages and is intended to fund. This teacher is worried the Defunding Policy will cause his new school board to cancel his program, causing devasting impacts to the students who benefit greatly from exposure to archery and outdoor education.

29.     As a third example—and there are many more—a physical education teacher (and SCI member) in Washington State was financially supported by SCI's Columbia Basin Chapter to attend AWLS and to run NASP in her school for almost a decade. She relies upon SCI's Columbia Basin Chapter to help keep her equipment maintained, to fund travel for students who qualify for the NASP national tournament, and to provide hands-on help to run state archery tournaments. This teacher integrates NASP into her school's physical education curriculum and offers NASP as an after-school activity. She has observed how much archery can improve the self-esteem of "quiet" kids, who did not consider themselves athletes. She teaches fourth and fifth grade and

finds that NASP develops a special confidence in these young athletes.  Her students view the bow as a "tool," and develop a healthy respect for this tool during their NASP training.  This teacher's school depends on federal funding under Title I-C of the Elementary and Secondary Education Act of 1965 ("ESEA"), among other provisions.  She fears that the school could deny her extracurricular approval to engage students in NASP due to concern that the Department will defund other programs if the archery program remains at the school.  This teacher has witnessed empirical benefits to her students from participating in NASP, and fears these benefits will be lost, and other students will not be able to gain the same benefits, because of the Defunding Policy.

30.     Plaintiffs and their members have real and concrete interests in maintaining archery, shooting sports, hunter education, and outdoor education programs in schools.  Plaintiffs provide the means for schools to initiate these programs.  They offer training, textbooks, equipment, and more for these programs.  Although Plaintiffs are willing to assist with additional funding and equipment, their resources are limited.  Their model has been to help programs get off the ground, then watch these programs flourish as part of a school's curriculum or extra-curricular offerings. Plaintiffs have not intended or provided the type of ongoing funding that would or could keep these programs running in the long term if the Defunding Policy remains in place.  Rather, Plaintiffs expect that schools will sustain these programs—in part, using federal education funds, including those provided under the ESEA.  In some instances, Plaintiffs' members are the very teachers who run these programs in schools.

31.     The Department's policy, which will defund these programs by prohibiting the use of ESEA funds for archery, shooting sports, hunter education, and outdoor education, disrupts Plaintiffs' model of initiating these programs, as well as Plaintiffs' educational missions.  It renders the schools largely unable to continue with these programs.

32.     The mere threat of reducing or removing federal education funding is enough to

cause the shut-down of these programs.  Tragically, the schools which most benefit from providing archery, shooting sports, hunter education, and outdoor education are also the most dependent on federal funding.  They are the most likely to cut these programs out of concern for losing federal funding, especially because the scope of the Defunding Policy has not been clearly stated or published for public review.  The Defunding Policy has turned archery, shooting sports, hunter education, and outdoor education programs that should be considered assets to a school into huge liabilities.

33.     Likewise, the threat of losing federal funding from application of the Defunding Policy has halted, and will continue to halt, extension of these programs.  Schools that are aware of the Defunding Policy but that have not yet started up these programs are no longer willing to do so.  These schools fear losing much-needed federal funding as a result of starting up these programs.

34.     The Defunding Policy injures Plaintiffs' organizational missions.  Each Plaintiff invests significantly in conservation education.  Specifically, Plaintiffs have invested millions of dollars to start up and support archery, shooting sports, hunter education, conservation science, and outdoor education in schools.  Some of Plaintiffs' members teach or otherwise directly support these programs in schools.  The Defunding Policy misinterpreting the BSCA, which has shut down some of these programs already and which will continue to shut them down, obstructs and thereby injures Plaintiffs' organizational activities and their members.

35.     Plaintiffs' injuries are directly traceable to the Defunding Policy.  But for that policy, schools would have no reason to fear losing their ESEA funding by merely offering archery, shooting sports, hunter education, and outdoor education opportunities to students.

36.     Plaintiffs' injuries will be redressed by a favorable ruling of this Court.

37.     Defendant Miguel Cardona is Secretary of the Department.  He is responsible for all

actions taken by the Department and for ensuring its compliance with the laws of the United States. He is sued in his official capacity.

38.     Defendant U.S. Department of Education is a cabinet agency in the Executive Branch of the federal government and an "agency" under the APA.  5 U.S.C. § 551(1).

## LEGAL FRAMEWORK

39.     The APA authorizes judicial review of a final agency action.  5 U.S.C. § 702.  The reviewing court may hold unlawful and set aside agency actions, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

40.     The ESEA, Pub. L. 89-10, forms the foundation for how federal funding is provided to primary and secondary schools.  Under the ESEA, the Department administers numerous grant programs to State and Local education agencies to improve educational programs and services for elementary and secondary school children.

41.     Title I-C of the ESEA provides federal grants to State education agencies to provide educational programs and services and enrichment activities to "migratory" children, "a child or youth who made a qualifying move in the preceding 36 months as a migratory agricultural worker or a migratory fisher."  34 C.F.R. § 200.81(g).

42.     Section 4108 of the ESEA allows Local education agencies to use federal funds for school activities which "foster safe, healthy, supportive, and drug-free environments that support student academic achievement."  Programs under Section 4108 may be conducted in partnership with non-profit or community organizations.  Section 4108 authorizes federal funds for programs which "support a healthy, active lifestyle," including "structured physical education activities and programs."  20 U.S.C. § 7118.

43.     Following several mass shooting tragedies perpetrated by teenagers, including the

14

shooting at Robb Elementary School in Uvalde, Texas, which killed 19 children and two adults, Congress enacted the BSCA.  The BSCA appropriated $1 billion to the Department for use, among other things, to support states in improving mental health services in schools and enhancing school security measures.

44.     While the BSCA is focused on improving school security, Congress did not want the Department's funds to be used for arming School Resource Officers.  Accordingly, Congress included an amendment in Section 13401 of the BSCA, which amended the ESEA to prohibit the use of ESEA funds "for the provision to any person of a dangerous weapon, as defined in section 930(g)(2) of title 18, United States Code, or training in the use of a dangerous weapon."

45.     Title 18 of the U.S. Code defines a "dangerous weapon" as "a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2½ inches in length."  18 U.S.C. § 930(g)(2).

## FACT ALLEGATIONS

**Importance of Archery, Hunter Education, and Outdoor Education in Schools**

46.     Educators regularly seek ways to improve student motivation, attention, behavior, attendance, and focus.  Wildlife agencies are concerned that young people are forgoing outdoor skills that will inspire them to spend time in wild places.  Archery and shooting sports can be the first step to becoming a hunter, conservationist, outdoor enthusiast, or someone who otherwise enjoys the outdoors and supports conservation.  To serve these educational and conservation purposes, NASP was developed by the Kentucky Departments of Fish and Wildlife Resources and Education, in collaboration with Mathews Archery.  NASP launched in 2002 in 21 middle schools. It expanded to 120 schools within its first year.  Since 2002, NASP has grown to almost 9,000

15

schools, with over 1.3 million students participating each year.[3]  Students love NASP because of its

egalitarian and accessible nature.  Nearly every student can participate, regardless of physical or

cognitive abilities.  Boys and girls compete on an equal playing field.  NASP provides a safe

opportunity for "non-traditional" athletes to experience success.  Further, students can take archery

home and continue to practice their skills for the rest of their lives—including in archery hunting.[4]

47.    Research has shown essential benefits from participating in NASP.  Among other

things, participants have an improved ability to focus and longer attention span, which in turn

contributes to higher test scores and better attendance, productivity, and behavior in school.[5]

Student surveys corroborate this research.  In these surveys, two-thirds of NASP participants

reported that their experience helped them pay attention and focus better when learning in school.[6]

Moreover, students participating in NASP reported higher self-esteem—they felt more capable to

take on the challenges of school, since they knew they could conquer the challenges of archery.[7]

48.    For these reasons, Plaintiffs strongly support NASP, as well as shooting sports,

hunter education, and outdoors education in schools.  Plaintiffs also support these programs

because they set students on the road to engaging in nature-based physical activity for the rest of

their lives.  Research shows, for example, that students are more likely to develop an interest in

---

[3] NASP, "Magic of NASP," https://www.naspschools.org/magic-of-nasp/.
[4] New Jersey Div. of Fish and Wildlife, National Archery in the Schools Program (NASP) in New Jersey, https://dep.nj.gov/njfw/education/national-archery-in-the-schools-program/.
[5] E.g., H.A. Asyan, The Effects of Archery as a Sports Branch on Coping with Stress, Studies on Ethno-Medicine 10(1):39-43 (Jan. 2016) (and research cited within this article), available at: https://www.researchgate.net/publication/299032464_The_Effects_of_Archery_as_a_Sports_Branch_on_Coping_with_Stress; F. Ustun et al., The Effect of Recreative Purpose Modern and Traditional Archery Education on Attention Parameters in Adolescents, 9 Journal of Education and Learning 244-50 (2020), Canadian Center of Science and Education, available at: https://eric.ed.gov/?id=EJ1244942; M.D. Duda et al., Major Findings of the National Archery in the Schools Program Student Survey (2005), available at: https://archerytrade.org/wp-content/uploads/2018/01/majorfindingsofnaspstudentsurvey.pdf.
[6] E.g., M.D. Duda et al., The NASP Evaluation: Summary of Results (2010), available at: https://www.iowadnr.gov/portals/idnr/uploads/shootingsports/nasprmsummaryreport.pdf.
[7] NASP, Ky. Dept. of Fish and Wildlife Resources, Responsive Management, Ky. Ass'n of School Admins., NASP 2017 Student Survey, available at: https://www.naspschools.org/download/student-survey/.

hunting after taking part in NASP.[8]

49.    Hunting gives participants a reason to be out in nature, often with family and friends. Like NASP participants, hunters report lower stress levels and greater self-esteem based on their experiences from hunting.[9]  Successful hunting offers the chance to be self-reliant by developing harvesting skills and obtaining free-range meat.  Hunters are also very proud of their contributions to wildlife management and conservation funding.

50.    Almost 16 million hunting licenses were sold across the United States in 2023.[10] Thirty-eight states offer hunter education courses in schools.  These programs promote responsible hunter behavior and teach students, especially young hunters, both firearm and hunting safety.  Due to this focus on safe participation, substantially fewer injuries occur while hunting compared to participation in many outdoor activities, including activities widely offered in schools.  The most state hunting licenses are sold in Texas and, according to Texas Parks and Wildlife, "[o]ver the last 30 years hunting accidents have drastically decreased, while the number of hunters has increased.  Today, hunting is one of the safest outdoor activities you can enjoy."[11]  In other words, hunting boasts widespread public engagement and a sparkling safety record.

---

[8] Pa. Game Comm'n, Assessing and Evaluating NASP (2010),
https://www.pgc.pa.gov/Education/NationalArcheryInTheSchoolsProgram/Documents/Assessing%20and%20Evaluating%20NASP.pdf.
[9] T. Abram, Health Benefits of Hunting, MSU Extension (Nov. 18, 2020)
https://www.canr.msu.edu/news/health_benefits_of_hunting.
[10] U.S. Fish and Wildlife Serv., Hunting Licenses, Costs, and Holders by Apportionment Year, https://us-east-1.quicksight.aws.amazon.com/sn/accounts/329180516311/dashboards/48b2aa9c-43a9-4ea6-887e-5465bd70140b?directory_alias=tracs-quicksight.
[11] Texas Parks and Wildlife, Hunter Education, https://tpwd.texas.gov/education/hunter-education/online-course/introduction.

| Outdoor Activity | Number of Participants | Annual Injuries | Injuries per 100,000 Participants |
|---|---|---|---|
| Football | 9,300,000 | 489,676 | 5,265 |
| Basketball | 26,900,000 | 528,524 | 1,965 |
| Bicycling | 39,800,000 | 530,551 | 1,333 |
| Baseball | 12,500,000 | 162,925 | 1,303 |
| Softball | 10,800,000 | 119,389 | 1,105 |
| Fishing | 33,800,000 | 69,963 | 207 |
| Swimming | 51,900,000 | 101,660 | 196 |
| **Hunting** | **16,300,000** | **8122** | **50** |

*2010 Participation & Injury national data released by the National Shooting Sports Foundation.*

51.     As firearms are frequently used in hunting, hunter education courses emphasize firearm safety.  They typically include hands-on examples with an inert (non-functioning) or an unloaded firearm.  Using an inert firearm as a demonstration aid improves students' test scores on the hunter safety examinations.  Shooting sports are conducted on target ranges designed for safety.

### The Department's Policy Misinterpreting the BSCA

52.     In November 2022, the Department made available a document titled, "Bipartisan Safer Communities Act Stronger Connections Grant Program Frequently Asked Questions" ("Stronger Connections policy guidance").  This document provides, to Plaintiffs' knowledge, the only source of public information about a grant program developed by the Department pursuant to the BSCA, "to create safe, healthy, and supportive learning environments."  Plaintiffs believe this document was posted on the Department's website, but not published in the Federal Register.[12]

53.     According to the Stronger Connections policy guidance, under Section 4108 of the ESEA, "using BSCA funds to establish, promote, or expand physical fitness and recreational activities is allowable."  The policy guidance further states that:

---

[12] The initial policy prepared by the Department is available at:
https://oese.ed.gov/files/2022/11/BSCA_Stonger_Connections_FAQs_11-2022-FINAL.pdf.  This policy was apparently updated and reposted on the Daprtment's website in April 2023, available at:
https://oese.ed.gov/files/2023/04/23-0083.BSCA-FAQs.pdf.

Physical activity that is age-appropriate, inclusive, and enjoyable supports positive physical health outcomes and may promote a sense of belonging, when well-structured.[fn]  Funds available under the Stronger Connections grant may support building programs, developing partnerships with local community-based programs that use evidence-based practices to combine physical wellness with mental and social well-being, and providing professional development on classroom physical activity or incorporating physical activity before and after school, among other possibilities.

54.     In a subsection titled "Prohibited Use of Funds," the Stronger Connections policy guidance provides:

**D-1.  May Stronger Connections funds be used to arm teachers or other individuals, or to provide training in the use of weapons?**

No.  Section 13401 of the BSCA amended Section 8526 of the ESEA to prohibit the use of ESEA funds, including those under Stronger Connections, to provide to any person a dangerous weapon or training in the use of a dangerous weapon.  A "dangerous weapon" as defined in section 930(g)(2) of title 18 of the United States Code is a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocketknife with a blade of less than 2 1/2 inches in length.  Accordingly, funds may not be used, for example, to purchase a firearm or to train teachers to use a firearm.

55.     In May 2023, the Department made available a document titled "Non-Regulatory Guidance" for the "Nita M. Lowey 21st Century Community Learning Centers Program."[13]  This program provides ESEA funds to support the creation of community learning centers for children during non-school hours.  These centers offer academic enrichment programs, as well as programs "that support a healthy and active lifestyle, including … regular, structured physical activity."  Again, to Plaintiffs' knowledge, this document was made available on the Department's website, but not published in the Federal Register.

56.     The Non-Regulatory Guidance document states that:

**E-6.  May 21st CCLC funds be used for activities with dangerous weapons?**

No funds under the ESEA may be used for the provision to any person of a

---

[13] https://oese.ed.gov/files/2023/05/DRAFT-21st-cclc-non-reg-guidance-for-publication.pdf.

dangerous weapon, as defined in 18 U.S.C. 930(g)(2), or training in the use of a dangerous weapon. Dangerous weapon is defined in section 930(g)(2) as a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocketknife with a blade of less than 2½ inches in length. (Section 13401 of the Bipartisan Safer Communities Act, amending section 8526 of the ESEA.)

57.     Going further than these published written guidance documents, the Department has developed a policy by which it has determined that ESEA funds cannot be used to support archery, hunter education, or outdoor education programs in schools. This Defunding Policy is based on the Department's misinterpretation of BSCA Section 13401. However, these programs promote a healthy and active lifestyle and provide structured physical activity, and they should fit under the criteria of the Stronger Connections Grant Program (funded with BSCA dollars) or the 21st Century Community Learning Centers Program.

58.     Despite a diligent search, Plaintiffs have been unable to locate any public notice and comment opportunity that the Department has provided on its Defunding Policy.

### Outcry Against the Defunding Policy

59.     In March 2023, an administrator of public education funds in Alaska asked the Department if the Stronger Connections policy guidance meant that ESEA funds could no longer be used to support archery or wilderness safety programs. A senior Department official, Sarah Martinez, responded that archery, hunter education, and outdoor education programs that provide, or provide training in the use of, items which are "technically dangerous weapons" may not be funded using federal grants authorized under the ESEA.[14]

60.     Based on this information, Plaintiffs believe the Department withheld ESEA funds that would have been used for archery, hunter education, or outdoor skills programs from

---

[14] https://www.foxnews.com/politics/biden-admin-paves-way-reverse-hunting-archery-crackdown-widespread-criticism.

at least one school district in Alaska and likely from school districts in other states.

61.     State education officials from Alaska and likely other states contacted Congress to object to the Defunding Policy.

62.     On July 10, 2023, Senators John Cornyn and Thom Tillis, two of the BSCA's four co-sponsors, sent a letter to Defendant Secretary Cardona.  The letter explained that these Senators

> were alarmed to learn recently that the [Department] has misinterpreted the BSCA to require the defunding of certain longstanding educational and enrichment programs—specifically, archery and hunter education—for thousands of children, who rely on these programs to develop life skills, learn firearm safety, and build self-esteem.

63.     The letter further objects to the Defunding Policy  as contradicting Congressional intent and the text of the law itself:

> The Department mistakenly believes that the BSCA precludes funding these enrichment programs.  Such an interpretation contradicts congressional intent and the text of the BSCA.  Indeed, the BSCA provides a billion dollars for activities under section 4108 of the Elementary and Secondary Education Act of 1965—or "activities to support safe and healthy students."  Such activities include programs that integrate health and safety practices into school or athletic programs, support a healthy, active lifestyle, and enhance students' effective learning skills.  Critical educational programs like archery and hunter education fall well within this scope and promote student safety and health.  We added that provision to ensure education funds would continue to support school enrichment programs and opportunities for students while other parts of the bill would specifically fund school resource officers and school hardening measures.  Using the BSCA as a pretext to shift critical educational and enrichment resources away from archery and hunter education classes was never the intent of the law.

64.     The Senators emphasized that "[t]he Department's decision to cancel critical funding has come at a significant cost to our students, and would actually contradict the BSCA's goal of promoting student mental health," with specific reference to the benefits of archery and hunter education in schools.

65.     Further, the Senators clarified that Section 13401 "was only meant to withhold funding from training School Resource Officers (SROs) with 'dangerous weapons,' not

enrichment programs for students."

66.    The letter ended with a request from Senators Cornyn and Tillis for the Department to "honor the text and the spirt of the BSCA and reconsider its decision to preclude funding for these critical programs."

67.    However, the Department did not heed this plea.  In late July, news media reported the Department was withholding funding for school hunting education and archery classes as a direct result of the Defunding Policy.  According to these reports, schools cancelled plans to include archery or hunter education in their curricula, specifically based on the Defunding Policy guidance.  Further, a Department spokesperson "confirmed" that under the Defunding Policy, no ESEA funds may be used for archery and hunter education, and the Department believes it "is administering the bipartisan law as written by Congress."[15]  A Department spokesperson was even more specific in declaring that the Department was not allowing use of funding for archery or hunter education under its view of the existing statutory language: "We are happy to provide technical assistance on legislative language to address this issue and restore allowability of ESEA funding for valuable enrichment opportunities for students, such as archery and hunter safety programs."[16]

68.    Based on this information, Plaintiffs believe that the Department has developed a national Defunding Policy.  Communications between Department officials and state education administrators are examples of this national policy, which was confirmed by the Department to

---

[15] Examples of this news coverage are available at: https://www.foxnews.com/politics/biden-admin-withholding-key-funding-schools-hunting-archery-programs; https://www.foxnews.com/politics/biden-admin-confirms-withholding-key-funds-schools-hunting-courses-shameful; https://www.foxnews.com/politics/sinema-manchin-rebuke-biden-admins-attack-school-archery-hunting-programs-gross-misinterpretation; https://www.foxnews.com/politics/biden-admin-paves-way-reverse-hunting-archery-crackdown-widespread-criticism.

[16] https://www.foxnews.com/politics/biden-admin-paves-way-reverse-hunting-archery-crackdown-widespread-criticism.

the news media.  To Plaintiffs' knowledge, however, this Defunding Policy has not been published in the Federal Register or on the Department's website.

69.    The third co-sponsor of the BSCA (of four), Senator Kyrsten Sinema, agreed with Senators Cornyn and Tillis that it was not Congress' intent to defund archery or hunter education in schools.[17]

70.    These Senators have doubled down on their opposition.  On September 5, 2023, 18 U.S. Senators—led by Cornyn, Tillis, and Sinema—sent a letter to Defendant Secretary Cardona.[18] Their letter objects that the Department has "misinterpreted the language" of the BSCA and states that Section 13401 was intended "to preclude [BSCA] funds from being used to purchase dangerous weapons for school staff or to train staff in the use of dangerous weapons, with the recognition that ESEA funds should support student achievement, educational enrichment programs, and student well-being."  The letter further objects that the Stronger Connections policy guidance and the Defunding Policy it reflects "contradicts Congressional intent."

71.    According to this letter, "the Department has encouraged local and state education agencies to seek alternative sources of funding for archery and hunting educational enrichment programs," which "is concerning because of the important role these enrichment programs can play in students' lives."  These Senators ended the letter by

> ask[ing] that the Department interpret the language as Congress intended and no longer ask educational entities to seek other funding sources for educational enrichment programs that align with the intent of ESEA—supporting student achievement and student well-being.  It is our hope that the Department will rethink its latest guidance that threatens students' access to these programs, which support pathways to professional success, community safety, and personal well-being.

---

[17] This information was reported in news coverage available at: https://www.foxnews.com/politics/sinema-manchin-rebuke-biden-admins-attack-school-archery-hunting-programs-gross-misinterpretation.

[18] This letter is available at: https://www.cornyn.senate.gov/wp-content/uploads/2023/09/Letter-to-Secretary-Cardona-to-Clarify-BSCA-re_-Archery-and-Hunting-Safety-Education-FINAL.pdf.

72.     More than 100 Members of Congress have joined similar letters or issued statements decrying the Defunding Policy and requesting that the Department reconsider its interpretation as contrary to the BCSA's language and purpose as well as to Congressional intent.

73.     On August 11, 2023, Plaintiffs sent a Notice of Intent to Sue to Defendant Secretary Cardona, warning Defendant Secretary Cardona that the Defunding Policy violates the APA and describing the claims asserted in this Complaint.  Plaintiffs requested that Defendants respond within ten days or otherwise Plaintiffs would file this lawsuit.  Plaintiffs received no response from Defendants.

74.     Notwithstanding these clear statements that the Defunding Policy is erroneous and contrary to law, the Department has not corrected its misinterpretation of the BSCA, and instead asserted that Congress must amend the BSCA to fix the problem.

**Plaintiffs Will Suffer Irreparable Harm Based on the Defunding Policy**

75.     Plaintiffs are currently suffering and will continue to suffer harm if the Department maintains its arbitrary and capricious interpretation of Section 13401 of the BSCA.  Plaintiffs have invested millions of dollars to support archery, shooting sports, hunter education, and outdoor education in schools.  As explained above, Plaintiffs' model is to set these programs in motion and then to rely on schools to use other funding to keep these programs going, including federal funding under the ESEA that has been available to date.

76.     Plaintiffs believe that the BSCA should provide even more funding to support these programs because of the positive mental, emotional, physical, and psychological benefits they provide and the authorizing language of Section 4108 and Title I-C of the ESEA.

77.     Plaintiffs' members who teach these programs or otherwise support them are also currently suffering and will continue to suffer harm if the Department maintains its Defunding Policy.

78.     If the Department continues to apply its Defunding Policy and misinterpret the BSCA, the programs that Plaintiffs have initiated and supported are at severe risk of closure.  These programs are at risk of losing their funding, or losing the support of their leadership and school boards out of concern that federal funding will be terminated merely because a school maintains an archery, shooting sports, hunter education, or outdoor education program.

79.     The Defunding Policy will frustrate the organizational purposes and missions of Plaintiff organizations.

80.     Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### (ACTION IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701-706)

81.     Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

82.     The APA requires a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or not in accordance with law."  5 U.S.C. § 706(2)(A).

83.     The Defunding Policy misinterpreting the BSCA to prohibit use of ESEA funds for archery, shooting sports, hunter education, or outdoor education programs, because these programs provide instruction in use of a "technically dangerous weapon," is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

84.     Congress has made clear that the Department is misinterpreting the BSCA and the Defunding Policy runs counter to Congressional intent in enacting the BSCA.  In a bill dedicating over $1 billion to improving mental health resources for students, Congress did not and would not bar funding for programs with a track record of fulfilling the BSCA's objectives.

25

85.     Moreover, the Defunding Policy leads to absurd results, in contravention of the APA.  If training bows and arrows and inert or unloaded firearms are dangerous weapons, then every golf club, tennis racket, baseball bat, shop hammer, kitchen knife (with a blade longer than 2.5 inches), etc. should also be so interpreted.  However, there is no doubt that Congress, in enacting the BSCA to increase the mental health resources available for students, never intended to cut off valuable enrichment programs and outlets for student mental and physical well-being.

86.     Further, the programs at issue do not involve "dangerous weapons."  Training bows and arrows and inert or unloaded firearms are not "weapons" at all.  But even if considered "weapons," training bows and arrows and inert or unloaded firearms are not "dangerous."  Training bows are set up with an extremely low draw weight to not cause injury, and training arrows lack any sort of cutting edge.  Inert firearms are modified so they cannot be fired.  Unloaded firearms lack a projectile that can be fired and cause injury.  The firearm used in shooting sports is not a dangerous weapon in the context of this use, where fired only on a target range designed for safety.  The Department's overbroad interpretation of BSCA Section 13401 errs in concluding that these training tools, which are incapable of causing harm, are "dangerous weapons."

**COUNT II**
**(FAILURE TO PROVIDE PUBLIC NOTICE AND COMMENT, 5 U.S.C. § 553)**

87.     Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

88.     The APA requires each federal agency provide notice and a public comment opportunity before promulgating a rule.  5 U.S.C. § 553.  A "rule" is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

89.     The Department's policy to preclude the use of ESEA funds for archery, shooting

sports, hunter education, and outdoor education in schools, is a rule that failed to meet the APA's rulemaking procedures. The Defunding Policy interprets the BSCA in a manner that affects a broad scope of unspecified school programs (and the students who participate in the programs), who have relied on ESEA funding for decades. The Defunding Policy is prospective in nature, as made clear in the Department's statements to state officials and to the news media.

90.     The Department did not publish the Defunding Policy in the Federal Register, and thus did not publish a proposal to adopt the policy and a request public comment on the proposed policy. Had the Department provided this opportunity before adopting this interpretation and cutting off the disbursement of funding to schools, Plaintiffs, Members of Congress, and others would have been able to weigh in and correct the Department's misinterpretation of the law. These actions were arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4).

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

1.     Declare that Defendants violated and continue to violate the APA by misinterpreting BSCA Section 13401 to preclude the use of ESEA funding for archery, shooting sports, hunter education, and outdoor education programs;

2.     Declare that Defendants violated the APA in failing to provide public notice and comment opportunity on the Defunding Policy;

3.     Declare that Defendants' decision and Defunding Policy was and continues to be arbitrary and capricious, and not in accordance with law, and therefore, in violation of the APA;

4.     Declare that Defendants violated and continue to violate the APA in encouraging State and Local education agencies to seek alternative sources of funding for these programs;

5.     Invalidate the portions of the Defunding Policy barring use of ESEA funds for archery, shooting sports, hunter education, and outdoor education;

6.     Enjoin Defendants from enforcing the Defunding Policy; and

7.     Order such other and further relief as this Court deems just and appropriate.

Dated this 14th day of September, 2023.

Respectfully submitted,

GIELOW GROOM TERPSTRA & MCEVOY, PLC

By: *s/ Daniel R. Olson (P64603)*
    Daniel R. Olson (P64603)
281 Seminole Road—2nd FL
Norton Shores, MI 49444
(231) 747-7160
daniel@ggtmlaw.com

*Attorney for Plaintiffs Safari Club International,*
*Safari Club International Bow Hunters West*
*Michigan Chapter, Inc., and*
*Sportsmen's Alliance Foundation*

By: *s/ Regina Lennox (DC Bar 1671299)*
    Regina Lennox (DC Bar 1671299)
Safari Club International
501 2nd Street NE
Washington, DC 20002
(202) 543-8733
rlennox@safariclub.org

*Attorney for Plaintiff Safari Club International*